UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION

United States of America,

    Plaintiff,

v.

David Scott,

    Defendant.

Case No.: 1:20-cr-00009-3

Judge Michael R. Barrett

## ORDER DENYING MOTION TO SUPPRESS EVIDENCE

This matter is before the Court on Defendant David Scott's Motion to Suppress Evidence (Doc. 81), as supplemented (Docs. 87, 88), which the Government opposes (Doc. 83).  The parties were given the opportunity for oral argument on February 12, 2021, at which time they advised the Court they wished to submit the matter on their briefs.  (Doc. 90).  For the reasons that follow, Defendant's Motion will be DENIED.

### I.  BACKGROUND

The following facts are set forth in the 29-page Affidavit in Support of Search Warrant executed by Tyler D. Field, a Special Agent with the Drug Enforcement Administration ("DEA") (Doc. 83-1 SEALED PAGEID 297–324) ("Field Affidavit") and the Government's memorandum in response to Defendant Scott's Motion (Doc. 83).

In November 2019, DEA agents were investigating Individual 1 for cocaine trafficking in the Cincinnati, Ohio area.  (Doc. 83 PAGEID 283).  On November 19, 2019, District Judge Susan J. Dlott signed an order authorizing the interception of wire communications to and from Individual 1's cellular telephone.  (Field Affidavit ¶ 9).  Thereafter agents intercepted a call between Individual 1 and Shannon Higgins on

1

November 23, 2019 that discussed Higgins selling drugs to Individual 1 at Individual 1's barbershop. (*Id.* ¶¶ 10, 11). Through surveillance, agents saw Higgins go to Individual 1's barbershop as discussed. (*Id.* ¶ 12). Agent Field believed that Higgins delivered drugs to Individual 1 in exchange for a $950 payment. (*Id.* ¶¶ 10–12). Higgins drove a white Ford Taurus to the barbershop. (*Id.* ¶ 12). On November 26, 2019, agents installed a court-authorized GPS tracking device Higgins' vehicle. (*Id.* ¶ 13).

On November 27, 2019, Higgins travelled to Luxury Sports Auto Sales ("Luxury Sports"), 5360 W. Third Street in Dayton, Ohio twice, once in the morning and once in the late afternoon. (*Id.* ¶¶ 14, 15). Higgins placed a call to Individual 1 within minutes of leaving the Luxury Sports parking lot the first time, but the call went unanswered. (*Id.* ¶ 14). Agents established surveillance during the late afternoon visit. Higgins arrived at 5:19 p.m. His vehicle was parked near two other vehicles. Luxury Sports appeared to be closed. All three vehicles left the parking lot at the same time, 5:22 p.m. (*Id.* ¶15). Higgins placed a call to Individual 1 shortly before he arrived at his home in Cincinnati. (*Id.* ¶ 15, 16). This time, Individual 1 answered the call and Higgins asked if the barbershop was closed. (*Id.* ¶ 16.). Agent Field believed that Higgins wanted to confirm there were no customers at Individual 1's barbershop so that their impending drug transaction would not be detected. (*Id.* ¶ 17).

Higgins set out for the barbershop and was followed by physical surveillance. (*Id.* ¶ 20). Meanwhile, Individual 1 received a call from a suspected drug customer and told him/her, consistent with the timing of Higgins' trip to the barbershop, things should be "good" in about half an hour. (*Id.* ¶¶ 18, 19). Agents observed, via camera, Higgins enter and exit the barbershop. (*Id.* ¶ 20). Approximately 45 minutes later, Individual 1

received another call from the same suspected drug customer who asked, "you get the stuff from him?" (*Id.* ¶ 21).[1]

Higgins travelled again to Luxury Sports on November 29, 2019. But before leaving his home to go to Luxury Sports, Higgins received a call from Q.D., a known cocaine distributor.[2] (*Id.* ¶ 24). Higgins and Q.D. had communicated seven times the day before. (*Id.* ¶ 23). Higgins' car was in the Luxury Sports parking lot on November 29, 2019 for approximately five minutes (12:50 p.m. to 12:55 p.m.), when it left and returned to Higgins' residence. Agent Field believed that Higgins obtained controlled substances while at Luxury Sports. (*Id.* ¶ 24). Shortly after arriving home, Higgins called Q.D. and twenty minutes later (1:51 p.m. to 2:11 p.m.) agents observed Higgins' vehicle leave his residence and arrive at Q.D.'s residence. Once there, Higgins called Q.D. and then exited his vehicle and entered Q.D.'s residence. (*Id.* ¶ 25). Within minutes (2:11 p.m. to 2:17 p.m.) Higgins and an unidentified male exited the residence, entered Higgins' vehicle, and return to Higgins' residence. (*Id.* ¶¶ 25–26). Agent Field believed that Higgins delivered controlled substances to Q.D. at Q.D.'s residence. (*Id.* ¶ 26).

On December 14, 2019, Higgins' vehicle again travelled from his residence to Luxury Sports, arriving at 3:11 p.m. Agents observed Higgins' vehicle park in the Luxury Sports parking lot. Agents also observed an unidentified male driver of a Nissan Maxima exit the Nissan and enter the front passenger seat of Higgins' vehicle. Minutes later (at 3:17 p.m.) Higgins and the unidentified male exited Higgins' vehicle and

---

[1] Agents were unable to determine if Individual 1 met with him/her. (Field Affidavit ¶ 22).
[2] Agents learned from a reliable confidential source in 2011 that Q.D. was a kilogram-level cocaine distributor. (Field Affidavit ¶ 6).

3

entered the Nissan. (*Id.* ¶ 29). The next Nissan's license plates were Ohio dealer plates registered to Luxury Sports Auto Sales, 5360 W. Third Street in Dayton, Ohio. (*Id.* ¶ 29 n.6).

At 3:38 p.m., a red Buick Lucerne arrived. Both Higgins and the unidentified male exited the Nissan and walked to the Buick. Higgins entered the front passenger seat of the Buick while the unidentified male stood next to the car. Higgins exited the Buick at 3:41 p.m., then got in his vehicle and drove away. Agent Field believed that Higgins obtained controlled substances while at Luxury Sports. (*Id.* ¶ 30). After leaving Luxury Sports, Higgins called Individual 1, asking "You about ready?" Agent Field believed that Higgins asked Individual 1 if he was ready to receive controlled substances from him. (*Id.* ¶ 32)

Back at Luxury Sports, the unidentified male entered the passenger seat of the Buick. Approximately five minutes later, the unidentified male and the driver of the Buick exited the Buick and walked to the front door of the Luxury Sports office building. The unidentified male checked inside the mailbox and opened the office door. A third unidentified male appeared and all three entered the office building. (*Id.* ¶ 31).

On December 27, 2019, Higgins' vehicle again travelled from his residence to Luxury Sports, arriving at 3:09 p.m. Not long after he parked the same Buick Lucerne arrived (at 3:34 p.m.). Higgins exited his vehicle and entered the front passenger seat of the Buick. A minute later, Higgins exited the Buick, entered his own vehicle, and departed. (*Id.* ¶ 34). Higgins thereafter called Q.D. (at 3:47 p.m.), which Agent Field believed was for the purpose of coordinating a future drug transaction. (*Id.* ¶ 37). The Buick drove to a different area of the parking lot and a male exited the driver's door.

(34). The Buick bore temporary license plates that were registered to Jerry Vaughn. (*Id.* ¶ 34). According to records maintained by the Ohio Secretary of State, Vaughn is listed as an organizer/representative for Luxury Sports Auto Sales, LLC. (*Id.* ¶ 35 ("incorporator/agent")). Agent Field believed that Higgins obtained controlled substances from Vaughn at Luxury Sports. (*Id.* ¶ 36). He based his belief on: (1) his belief that Higgins obtained controlled substances from Luxury Sports in the past; (2) his belief that Higgins obtained controlled substances from someone inside the red Buick Lucerne on December 14, 2019; (3) his knowledge that Higgins briefly met with Vaughn inside the same Buick Lucerne that day; and (4) his knowledge that Vaughn is an "owner" of Luxury Sports. (*Id.*).

On January 4, 2020, Higgins' vehicle again travelled from his residence to Luxury Sports. Just prior to his 11:41 a.m. arrival, agents observed the same Buick Lucerne arrive at Luxury Sports. When Higgins arrived, Vaughn exited the Buick and entered the front passenger door of Higgins' vehicle. A minute later, Vaughn exited Higgins' vehicle, entered the Buick, and departed. Higgins also departed and travelled directly back to his residence. (*Id.* ¶ 38). Agent Field believed that Higgins obtained controlled substances from Vaughn at Luxury Sports. (*Id.* ¶ 39). He based his belief on: (1) his belief that Higgins obtained controlled substances from Vaughn at Luxury Sports in the past; (2) his knowledge that Higgins briefly met with Vaughn inside Higgins' vehicle; and (3) his knowledge that Vaughn is an "owner" of Luxury Sports. (*Id.*).

On January 9, 2020 and January 16, 2020, agents pulled Vaughn's trash placed outside his residence. (*Id.* ¶¶ 41, 42). On January 9, they seized multiple kilogram-sized wrappers with white residue, a large gallon size bag, vinyl gloves, and mail

5

addressed to Vaughn.  (*Id.* ¶ 41).  On January 16, agents seized a single kilogram wrapper with white residue, several wrappers, and vinyl gloves.  (*Id.* ¶ 42).

On January 16, 2020 (at 1:15 p.m.), agents observed a blue Subaru Outback, registered to Vaughn, parked in the parking lot at Luxury Sports.  An unidentified individual walked away from the Subaru and entered the passenger seat of a black GMC pick-up truck. Thirteen minutes later, the unidentified individual exited the GMC pick-up truck and entered the Subaru.  Another unidentified individual exited the GMC pick-up truck and entered a different black truck.  All three vehicles departed.  (*Id.* ¶ 43).

On January 23, 2020, Higgins received a call from Q.D., in which Higgins said, "it's on tomorrow, I'll go up, I'll go over there you know what I'm sayin' and do what I been doin'."  (*Id.* ¶ 45).  Agent Field believed that Higgins was telling Q.D. that he was going to go to Luxury Sports to obtain controlled substances for Q.D.  (*Id.* ¶ 46).

On January 24, 2020, Magistrate Judge Stephanie K. Bowman issued a search warrant for the property at 5360 W. 3rd Street, Dayton, Ohio 45417, which was described as follows:

> 5360 W. 3rd Street, Dayton, Ohio 45417 is described as a car dealership consisting of a parking lot and an office building.  The office building is a tan building,  The front door of the office building faces north and has a black security door.  To the left of the front door is a window with writing that reads "Martin Power Sports Auto Sales LLC DBA MPS Autosales."  To the right of the front door is a glass window with writing that reads "Luxury Sports Auto Sales 937-640-1737".  The numbers "5360" appear to the left of the front door in black numbers on a white background.
>
> Any and all vehicles located within outbuildings, garages, and/or the curtilage.

(Doc. 83-1 SEALED PAGEID 327).³ During the execution of the warrant on January 27, 2020, DEA agents seized approximately 80 kilograms of cocaine inside a metal cylinder on a forklift located in the Luxury Sports office building. (Doc. 83 PAGEID 283, 285).

On February 6, 2020, a federal grand jury indicted Vaughn and Higgins with violations of 21 U.S.C. §§ 841(a)(1), 841(b)(1), and 846. (Doc. 16).⁴ On June 17, 2020, the grand jury returned a superseding indictment against Vaughn and Defendant Scott. Defendant Scott is charged with a narcotics conspiracy in violation of 21 U.S.C. § 846 (Count 1) and possession with intent to distribute five kilograms or more of cocaine in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(A) (Count 3). (Doc. 44).

Defendant Scott argues that the search warrant issued for Luxury Sports, specifically the office building structure, lacks probable cause. (Doc. 81). He asks that all evidence seized be suppressed as the "fruit of the poisonous tree" pursuant to *Wong Sun v. United States*, 371 U.S. 471 (1963). (*Id.* PAGEID 279).

## II.     STANDARD OF LAW

### A.  Probable Cause

The Fourth Amendment prohibits "unreasonable searches and seizures" and provides that "no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend IV. In determining whether a search warrant is

---

³ Search warrants also were issued for Vaughn's residence, Higgins' residence, and Q.D.'s residence as well as Vaughn's vehicles and Higgins' vehicle. (Doc. 83 PAGEID 284). These warrants, like the one for Luxury Sports, were executed on January 27, 2020 following a meeting between Higgins and Vaughn. (*Id.*). Higgins had cocaine in his vehicle that he had purchased from Vaughn. (*Id.* at 284–85). Vaughn had U.S. currency in his vehicle that Higgins used to buy the cocaine. (*Id.* at 285). Vaughn also had additional U.S. currency, a firearm, and more cocaine at his residence. (*Id.*).
⁴ On July 14, 2020, Higgins pled guilty to a superseding information charging one count of possession of cocaine with intent to distribute in violation of 21 U.S.C. §§ 841(a)(1), 841(b)(1)(C). (Docs. 25, 27, 62).

7

supported by probable cause, a court may consider only the "four-corners of the affidavit." *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (citing *Whiteley v. Warden, Wyo. State Penitentiary*, 401 U.S. 560, 565 n.8 (1971)).[5] An affidavit must show a "likelihood of two things" to establish probable cause for a search. *Id.* (internal quotations and citations omitted). They are: "first, that the items sought are seizable by virtue of being connected with criminal activity; and second, that the items will be found in the place to be searched." *Id.* (citing *United States v. Church*, 823 F.3d 351, 355 (6th Cir. 2016) (quoting *Zurcher v. Stanford Daily*, 436 U.S. 547, 555 n.6 (1978))) (internal quotations omitted).[6]

Probable cause exists when "common-sense" suggests a "fair probability" that contraband or evidence of a crime "will be found in a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983). "[T]he affidavit supporting the search warrant must demonstrate a nexus between the evidence sought and the place to be searched." *United States v. Brown*, 828 F.3d 375, 382 (6th Cir. 2016) (citing *United States v. Carpenter*, 360 F.3d 591, 594 (6th Cir. 2004) (en banc)). "The connection between the [property] and the evidence of criminal activity must be specific and concrete, not 'vague' or 'generalized.'" *Id.* (quoting *Carpenter*, 360 F.3d at 595).

Probable cause "is not a high bar." *Kaley v. United States*, 571 U.S. 350, 338 (2014). "It requires only the kind of fair probability on which reasonable and prudent [people,] not legal technicians, act." *Id.* (citing *Florida v. Harris,* 133 S. Ct. 1050, 1055

---

[5] Thus, "information known to the officer but not conveyed to the magistrate is irrelevant." *United States v. Abernathy*, 843 F.3d 243, 249 (6th Cir. 2016) (quoting *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010) (citation omitted)).
[6] "[E]vidence of a crime" is a critical component of a search warrant. *Armstrong v. City of Melvindale*, 432 F.3d 695, 700 (6th Cir. 2006) (citing *Zurcher*).To this end, an applicant for a search warrant must recite the statutory violation for which the warrant is requested on the face of the warrant or in the affidavit in support. *See United States v. Abboud*, 438 F.3d 554, 569–71 (6th Cir. 2006).

(2013) (quoting *Gates*, 462 U.S. at 231, 238)) (internal quotations omitted) (alteration in original).  A reviewing court should give "great deference" to a magistrate judge's probable cause determination and reverse only if it was "arbitrarily" made.  *United States v. Frechette*, 583 F.3d 374, 379 (6th Cir. 2009).  And it should not engage in "line-by-line scrutiny of the warrant application's affidavit."  *United States v. Williams*, 544 F.3d 683, 686 (6th Cir. 2008).  The affidavit should be judged "on the adequacy of what it does contain, not on what it lacks, or what a critic might say should have been added."  *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000).

    **B.  Good-Faith Exception to Exclusionary Rule**

"When evidence is obtained in violation of the Fourth Amendment, the judicially developed exclusionary rule usually precludes its use in a criminal proceeding against the victim of the illegal search and seizure."  *Illinois v. Krull*, 480 U.S. 340, 347 (1987).  But courts typically should not suppress "evidence obtained in objectively reasonable reliance on a subsequently invalidated search warrant."  *United States v. Leon*, 468 U.S. 897, 922 (1984).  The four specific situations in which an officer's reliance cannot be considered "objectively reasonable" are:  (1) when the warrant is issued on the basis of an affidavit that an affiant knows—or is reckless in not knowing—contains false information; (2) when the issuing magistrate abandons his or her neutral and detached role and serves as a rubber stamp for police activities; (3) when the affidavit is so lacking in indicia of probable cause that a belief in its existence is objectively unreasonable; and (4) when the warrant is so facially deficient that it cannot reasonably be presumed to be valid.  *United States v. Laughton*, 409 F.3d 744, 748 (6th Cir. 2005) (citing *Leon*).

### III. ANALYSIS

### A. Defendant Scott Has Standing to Challenge the Warrant

"Property used for commercial purposes is treated differently for Fourth Amendment purposes from residential property." *Minnesota v. Carter*, 525 U.S. 83, 90 (1998). "'An expectation of privacy in commercial premises[ . . . ] is different from, and indeed less than, a similar expectation in an individual's home.'" *Id.* (quoting *New York v. Burger*, 482 U.S. 691, 700 (1987)). The United States argues, consequently, that Defendant Scott must demonstrate a "significant connection" to Luxury Sports Auto Sales in order to claim an expectation of privacy in the office building structure. (Doc. 83 PAGEID 287).

In response, Defendant Scott provides the General Warranty Deed in which the real estate located at 5360 W. 3rd Street was transferred to him by his father (Robert L. Scott) on April 9, 1998 (Doc. 88-1), as well as the Articles of Organization issued by the Ohio Secretary of State (on February 10, 2017) listing him as a "Manager" and the appointed statutory agent for Luxury Sports Auto Sales LLC (to be served at 5360 W. 3rd Street) (Doc. 88)[7]. Based on these documents, the authenticity of which has not been challenged by the United States, the Court concludes that Defendant Scott has standing to challenge the search warrant of Luxury Sports Auto Sales' commercial premises.

---

[7] As required by statute, Defendant Scott's appointment as statutory agent for Luxury Sports Auto Sales LLC was signed by two "managers" (himself and Marcus Lowery) as well as a "representative" (Jerry Vaughn as "Treasurer"). *See* Ohio Rev. Code § 1705.06(B)(1)(a) (Statutory agent) ("The secretary of state shall not accept original articles of organization of a limited liability company for filing unless the articles are accompanied by . . . [a] written appointment of an agent . . . that is signed by an authorized member, manager, or other representative of the limited liability company[.]").

**B. Probable Cause Supports the Warrant Authorizing the Search of the Office Building Structure**

Defendant Scott argues that the Field Affidavit is "void" of any reference to illegal drug activity within any "actual structure" at Luxury Sports. (Doc. 87 PAGEID 348). He contends that drug transactions occurred only in the parking lot of Luxury Sports and that there is "nothing to suggest" that any illegal activity occurred in any structure. (*Id.*). The Court disagrees. The facts described in the Field Affidavit, viewed against *Gates*' totality-of-the-circumstances standard[8], most certainly demonstrate a "fair probability" that evidence of drug trafficking would be found at Luxury Sports, including the office building structure. By way of summary:

- Agents determined that Higgins was selling controlled substances to Individual 1 at Individual 1's barbershop.[9]

- Higgins travelled to Luxury Sports six times; his brief meetings in the parking lot were consistent with drug trafficking.

- After travelling to Luxury Sports, Higgins met or attempted to meet with Individual 1 or Q.D., both cocaine distributors, consistent with drug trafficking.

- On one of his trips to Luxury Sports (on December 14, 2019), Higgins met with a person driving a vehicle (a Nissan Maxima) registered to Luxury Sports and with a person driving a vehicle (a Buick Lucerne) registered to Jerry Vaughn, an organizer/representative of Luxury Sports.

- Agents observed (on December 14, 2019) the driver of the Nissan Maxima and the person they believed to be Jerry Vaughn enter the office building structure after selling controlled substances to Higgins. The driver of the Nissan Maxima checked inside the mailbox before entering.

- Higgins met two more times with the Buick Lucerne registered to Vaughn.

---

[8] *Gates*, 462 U.S. at 230.
[9] A reliable confidential source later confirmed that Higgins sold cocaine to Individual 1 for $1,000/ounce. (Field Affidavit ¶ 28).

11

- Agents corroborated their belief that Vaughn was selling drugs through two separate trash pulls at Vaughn's residence.

- Agents saw a different vehicle (a Subaru Outback) registered to Vaughn parked in the parking lot at Luxury Sports; its driver's meeting with two other vehicles parked in the lot were consistent with drug trafficking.

- Agents intercepted a call (on January 23, 2020) during which Higgins told Q.D. he was planning to go to Luxury Sports the next day to get more cocaine.

Defendant Scott is correct that the Field Affidavit focuses largely on the illegal activity of Jerry Vaughn (in addition to Shannon Higgins). But Vaughn has a direct paper connection to Luxury Sports as one of its organizers, who, in his role as "representative" (specifically, "Treasurer"), appointed Defendant Scott as Luxury Sports' statutory agent.

Defendant Scott invites the Court to conclude that Vaughn's role as "Treasurer"[10] is inferior to Scott's role as "Member"[11] in organizing Luxury Sports as a limited liability company[12] and, therefore, is too thin a link to support probable cause. (Doc. 87 PAGEID 350). Vaughn's connection to Luxury Sports, however, goes beyond the organization papers. Vaughn physically entered the office building structure on December 14, 2019, along with an individual driving a vehicle (a Nissan Maxima) registered to Luxury Sports, after a suspected drug sale to Higgins. A search based solely on Vaughn's designation as "Treasurer" of Luxury Sports (or, hypothetically,

---

[10] *See* Ohio Rev. Code § 1705.291 (Officers) ("A limited liability company may have officers.").
[11] According to the organization papers, Defendant Scott is not a "member," but, rather, a "manager." These designations are different under the applicable statute. *See, e.g.*, Ohio Rev. Code §§ 1705.281 (Duties of a member); 1705.282 (Effect of written appointment and agreement on standard of care of a manager who is also a member or a representative of a member); 1705.29 (Managers; standard of care).
[12] To make such a determination, at the very least the Court would need to examine Luxury Sports' operating agreement (*see* Ohio Rev. Code § 1705.081) and bylaws (*see* Ohio Rev. Code § 1705.27). Neither of these documents, presuming they exist, were made part of the record.

12

Defendant Scott's designation as "Member") would not, by itself, be enough to justify a search the office building structure. That designation, however, *combined* with multiple suspected drug sales in the parking lot of Luxury Sports—a business that appeared to be closed—and entrance into the structure immediately after one such sale is a reasonable basis "for believing there were drugs or evidence of drug trafficking [inside the structure located at 5360 W. 3rd Street, Dayton, Ohio 45417]." *United States v. Burney*, 778 F.3d 536, 540 (6th Cir. 2015). As noted earlier, probable cause "is not a high bar," see *Kaley,* 571 U.S. at 338, and it has been met here.

### C. Good-Faith Exception to Exclusionary Rule Would Apply

Had the opposite conclusion prevailed, the Court determines that the *Leon* good-faith exception to the exclusionary rule nevertheless would apply.[13]

"An affidavit that is so lacking in indicia of probable cause that no reasonable officer would rely on the warrant has come to be known as a 'bare bones' affidavit." *United States v. White*, 874 F.3d 490, 496 (6th Cir. 2017) (citing *United States v. Weaver*, 99 F.3d 1372, 1380 (6th Cir. 1996)). A bare bones affidavit is one that states only "suspicions, beliefs, or conclusions, without providing some underlying factual circumstances regarding veracity, reliability, and basis of knowledge." *Id.* (quoting *Laughton*, 409 F.3d at 748 (quoting *Weaver,* 99 F.3d at 1378)). Yet if the reviewing court can identify "**some** connection, regardless of how remote it may have been"—"some modicum of evidence, however slight"—"between the criminal activity at issue and the place to be searched," then the affidavit is not bare bones and reliance on it is reasonable. *Id.* at 497 (quoting *Laughton*, 490 F.3d at 749–50) (emphasis in original).

---

[13] Defendant Scott does not address the *Leon* good-faith exception in either of his briefs.

13

Further, a bare bones affidavit should not be confused with one that lacks probable cause, and the distinction is not one of semantics. *Id.* "There must be daylight between the 'bare-bones' and 'substantial basis' standards if *Leon*'s good-faith exception is to strike the desired balance between safeguarding Fourth Amendment rights and facilitating the criminal justice system's truth-seeking function." *Id.*

Applying this standard, the Field Affidavit is clearly not a bare bones affidavit. Intercepted phone calls, physical surveillance and trash pulls, along with information learned from confidential sources, would allow a reasonable officer "employing a healthy dose of common sense" to conclude that the parking lot of Luxury Sports was an ongoing site of drug trafficking. *See id.* at 502 (citing *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001)). One of the traffickers, Jerry Vaughn, was associated on paper with Luxury Sports, the corporate entity. Plus, Vaughn entered the Luxury Sports office building structure after one of his suspected drug sales. Plus, another suspected trafficker, who drove a vehicle registered to Luxury Sports, entered the structure with Vaughn, first checking the Luxury Sports mailbox. These details more than suffice to connect drug trafficking with the inside of the Luxury Sports office building as well.

In the alternative, therefore, *Leon*'s good-faith exception applies and saves the search at Luxury Sports, including the office building structure.

## IV. CONCLUSION

Based on the foregoing reasons, Defendant David Scott's Motion to Suppress Evidence (Doc. 81), as supplemented (Docs. 87, 88), is hereby **DENIED**.

**IT IS SO ORDERED**.

                                        */s/ Michael R. Barrett*
                                        JUDGE MICHAEL R. BARRETT